John E. **MASSENGALE**, Trustee

v.

**TRANSITRON ELECTRONIC CORPORATION.**

Civ. A. No. 65-89-G.

United States District Court
D. Massachusetts.

April 6, 1967.

Harold Katz, Boston, Mass., for plaintiff.

Harold M. Willcox, Boston, Mass.. for defendant.

## OPINION

GARRITY, District Judge.

This suit was initiated by McClellan & Burck, Inc. ("M & B"), which was formerly a corporation in the business of planning and effecting mergers of business corporations,[1] against Transitron Electronic Corporation ("Transitron") for violating alleged obligations to M & B arising out of an agreement between the defendant and Thermo King Corporation ("Thermo King") pertaining to the acquisition of Thermo King by the defendant. The complaint as amended alleges that the defendant wrongfully prevented the consummation of the proposed acquisition and thereby prevented M & B from realizing a substantial commission which the defendant had agreed to pay. Comprehensive depositions of the principals of the corporations have been taken and the defendant has moved for summary judgment.

[1]. On March 13, 1964 McClellan & Burck, Inc., was liquidated and thereafter John E. Massengale, the substituted plaintiff, became trustee for the shareholders.

At a hearing on the motion, it appeared that the following material facts are undisputed:

1. Plaintiff's predecessor was a corporation which planned, originated and negotiated corporate acquisitions and mergers. In June 1958 Arthur A. Burck, its president, contacted Joseph Numero, president of Thermo King, at its principal offices in Minnesota and offered his services to find for it suitable opportunities for corporate combination. During the next two years Burck explored over twenty merger and acquisition possibilities for Thermo King. All the expense was borne by M & B on the understanding that, if an acquisition should be consummated, M & B would receive a fee amounting to 10% of the acquisition price up to a maximum of $325,000 (later reduced to $300,000).

2. In March 1960 Burck wrote to Mark W. Cresap, president of the Westinghouse Electric Company ("Westinghouse") and suggested that it might be interested in acquiring an unnamed client of M & B. In June and July, 1960 meetings were held between representatives of Westinghouse and Thermo King. Negotiations had also begun with David Bakalar, president of the defendant, whose principal place of business is in Massachusetts, and by July 11, 1960 the defendant had expressed an interest in proceeding forward. On that date Burck wrote to Numero and confirmed the interest of both Westinghouse and Transitron. Burck enclosed a letter of agreement dated July 11, 1960 setting out the basis of M & B's fee in the event of a merger, exchange of stocks or similar transaction with any company where the transaction was originated by M & B; and providing that the fee would be paid by Thermo King unless the acquiring company or combined company agreed to pay it. Numero signed the agreement on behalf of Thermo King on the condition that the acquiring company approve the amount of the fee.

3. During the summer of 1960 negotiations with the defendant continued. On August 15, 1960 Burck agreed with Thermo King that the fee for effecting a Thermo King-Transitron transaction would be $300,000. On August 18, 1960 Burck wrote to Westinghouse informing it of the proposed acquisition of Thermo King by Transitron and suggesting that Westinghouse not spend further time on the matter unless it should have further word from M & B.

4. On October 29, 1960 the defendant and Thermo King entered into an "Agreement and Plan of Reorganization" providing for the defendant's acquisition of Thermo King and setting out various undertakings to be performed by the parties. It was provided that neither party would be obligated to perform any of the undertakings unless at the date of the closing certain conditions were met, although each party agreed to use its best efforts to comply with the conditions. These conditions included, among other things, that Thermo King would call a meeting of its stockholders as soon as practicable to vote upon the plan, and that there had been no material adverse change in the financial condition of Thermo King. Paragraph 12 of the agreement dealt with brokerage commissions and read as follows:

> 12. *Commissions.* Transitron and Thermo King each represents that neither of them has retained any broker or paid or agreed to pay any brokerage fee or commission to any agent or broker for or on account of the transactions herein contemplated, except that Thermo King has agreed to pay a fee of $300,000 to Messrs. McClellan & Burck, Inc., of New York, New York, in the event that said transactions are consummated, but not otherwise. Such fee shall be paid by Transitron if and when such transactions are effected.

The agreement also provided that the plan would be governed by Minnesota law.

5. The defendant's acquisition of Thermo King was never consummated. On December 19, 1960 the defendant sent written notice to Thermo King terminating the agreement on the grounds that there had been a material adverse change

in Thermo King's business and that Thermo King had failed to call a stockholders' meeting in accordance with the agreement.[2] On December 22, 1960 Burck wrote to Westinghouse and informed it that the proposed Transitron-Thermo King transaction had aborted. Negotiations with Westinghouse resumed and on June 30, 1961 a contract between the two companies was executed. The following paragraph appeared in that contract:

10. Each party represents that it has not incurred, and shall not incur, any liability for brokerage fees or agents' commission in connection with this Agreement or the sale and purchase which is the subject hereof, except that Thermo King has agreed to pay a fee not exceeding $325,000 to Messrs. McClellan & Burck, Inc., New York, New York, in the event that said transactions are consummated but not otherwise.

6. There was no other agreement between M & B and Thermo King respecting the payment of fees besides the letter of July 11, 1960, which based the fee on percentages of the value of the consideration received by the company or its shareholders, 5% of the first million dollars, 2½% of the next nine million and 1% over ten million. The $300,000 fee provided for in the Transitron-Thermo King agreement of October 29, 1960 indicates that the value of the defendant's stock to be received by Thermo King was somewhat in excess of $10,000,000.

7. The Westinghouse-Thermo King transaction was closed on August 14, 1961, at which time M & B received a check for $325,000, paid by Thermo King.

In opposing the defendant's motion for summary judgment, the plaintiff contends that the defendant was not excused from its obligation to pay the $300,000 fee under the Transitron-Thermo King agreement if the failure of consummation was the result of the defendant's wrongful conduct; and that there is a genuine issue of material fact as to whether the defendant's refusal to consummate the earlier agreement with Thermo King was wrongful.

■ The initial question before the court is the choice of applicable law. Being a diversity action, the law of the forum state determines questions of conflicts of law. Klaxon Co. v. Stentor Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. The contract between Transitron and Thermo King was formed and executed in Massachusetts and the law of the place of contracting would normally govern.[3] See 2 Beale, The Conflicts of Law § 332.29 at 1142 (1935). However, it provided explicitly that "The plan * * * shall be governed by Minnesota law * * *."

■ Would a Massachusetts court give effect to the agreement of Transitron and Thermo King that their rights be determined by Minnesota law? An affirmative answer is indicated by Maxwell Shapiro Woolen Co., Inc. v. Amerotron Corp., 1959, 339 Mass. 252, 257, 158 N.E. 2d 875; Mittenhal v. Mascagni, 1903, 183 Mass. 19, 21–22, 66 N.E. 425, 60 L.R.A. 812; Powers v. Lynch, 1807, 3 Mass. 76, 80. In cases in which Massachusetts courts have refused to enforce such a contract provision, e. g. Harwood v. Security Mutual Life Insurance Company, 1928, 263 Mass. 341, 161 N.E. 589, contracts have been drafted in advance by one party and the specification of applicable law has been imposed upon the other. See Fine, Massachusetts Contract Cases and

2. The plaintiff noticed depositions designed to establish that the grounds asserted by the defendant were invalid, but the court without objection directed that these depositions be stayed pending hearing and decision of the defendant's motion for summary judgment. With respect to such grounds, it does not appear that Thermo King ever complained.

3. If it did, the plaintiff would have no cause of action and the defendant's motion would be allowed on the ground that Massachusetts law with exceptions not here applicable will not allow a person not a party to a contract, known as a third party beneficiary, to bring an action on that contract. Marshall v. Landon, 1941, 308 Mass. 239, 31 N.E.2d 540.

Problems in the Choice of Law, 43 Mass. L.Q., No. 3, 46. The record in this case contains no evidence of imposition. Thermo King was a Minnesota corporation with its principal office in that state and it is not surprising that the parties would agree that the terms and conditions of the acquisition agreement should be determined under Minnesota law.

Massachusetts courts will look to the law of Minnesota not only with respect to construction of the agreement but also to determine who may bring suit upon it. See Simmons v. Gryzmish, 1932, 279 Mass. 319, 181 N.E. 191. Restatement, Conflict of Laws §§ 607, 612 (1934). While ordinarily suit on a contract governed by Massachusetts law may be maintained in the Commonwealth only by a party to the contract, Mellen v. Whipple, 1854, 67 Mass. (1 Gray) 317, there are exceptions to the rule, e. g. suits on certain contracts under seal, and it does not embody any strong public policy of the Commonwealth.

Although M & B was not a party to the agreement between the defendant and Thermo King, it was a so-called creditor beneficiary of paragraph 12 of the agreement providing for brokerage commissions. Under Minnesota law, which follows the principles stated in Restatement, Contracts §§ 133–147 (1932), LaMourea v. Rhude, 1940, 209 Minn. 53, 295 N.W. 304, 306, the plaintiff may maintain an action to enforce M & B's rights under the agreement. The issue here is the nature of M & B's rights.

■ Under Minnesota law a third party beneficiary who sues on a contract made for his benefit is bound by the terms of that contract. Brix v. General Accident & Assurance Corporation, 1958, 254 Minn. 21, 93 N.W.2d 542, in which the court said, at 544:

It would seem elementary, however, that any third party bringing this type of action on an insurance contract must be limited strictly to the terms and promises made in the contract involved.

His rights depend upon, and are measured by, the terms of the contract.

In this case it is clear from the language of paragraph 12 of the contract that the defendant's contractual obligation to M & B was limited in two respects. First, it was derivative from and co-extensive with Thermo King's promise to M & B in the letter agreement of July 11, 1960 which was conditioned upon consummation without qualification. Thermo King's promise to M & B was not, for example, coupled with any undertaking that it would use its best efforts to bring about consummation. Its complete dependency upon consummation is underscored by the fact that the fee was to be based upon percentages of the consideration received by Thermo King under an acquisition agreement. Secondly, the last sentence of paragraph 12 provides directly that the defendant's obligation would arise only "if and when such transactions are effected." Therefore, since the Transitron-Thermo King deal fell through and the plaintiff's rights "depend upon, and are measured by, the terms of the contract", the provisions of paragraph 12, without more, afford no basis for a recovery by the plaintiff.

■ The plaintiff seeks to avoid the failure of a condition precedent to its rights by invoking a principle stated in a line of Minnesota cases, that a broker may collect a commission from his principal when he has produced a satisfactory customer who has become bound to buy and the principal arbitrarily refuses to consummate the transaction, e. g., Huntley v. Smith, 1922, 153 Minn. 297, 299, 190 N.W. 341 and Flower v. Davidson, 1890, 44 Minn. 46, 48, 46 N.W. 308.[4] While usually employed for the benefit of real estate brokers, the principle also applies to contracts with other types of brokers. See Chapman v. Merchant's Trust Co., 1931, 184 Minn. 467, 239 N.W. 231. In my view the Huntley and Flower decisions do not help the plaintiff here because they impose liability upon principals by whom brokers were engaged and

4. The principle has not been applied in any Minnesota case known to the court involving a third party beneficiary.

to whom valuable services were rendered, whereas in this case M & B and the defendant had no relationship apart from the Transitron-Thermo King agreement. Moreover, the theory of liability stated in the *Huntley* and *Flower* cases seems restricted to situations in which the contract between the principal and the third party requires consummation unconditionally or no conditions to consummation remain unperformed. In my opinion, the existence in the Transitron-Thermo King agreement of conditions in addition to the condition of consummation, e. g. Thermo King's undertaking to call a meeting of its shareholders, is a critical distinction. Cf. Chapman v. Merchant's Trust Co., supra. While this agreement did contain promises by the parties to use their best efforts to bring about consummation, I consider that they were reciprocal only and that M & B was not a third party beneficiary of such promises.

, The defendant has also submitted, as a separate ground for decision, that Thermo King's payment of $325,000 to M & B on August 14, 1961 in connection with its acquisition by Westinghouse satisfied any liability of the defendant to M & B and its successor, the plaintiff. The relevant facts are undisputed: M & B interested Westinghouse in the advantages of acquiring Thermo King before it interested the defendant, having begun discussions with Westinghouse in March, 1960. M & B began parallel negotiations with the defendant in June. On July 11, 1960, M & B and Thermo King agreed on compensation for M & B "in the event a merger, exchange of stocks or similar transaction is consummated with *any* company." (Emphasis added.) A covering letter from M & B to Thermo King stated that the agreement had been redrafted "since both Westinghouse and Transitron are now in the picture." By August 18, 1960, negotiations with the defendant had reached a point at which a contract seemed likely and on that date M & B wrote to Westinghouse, stating in part:

> While the agreement with Transitron is not final, and consequently there

is always the possibility that it may abort, I cannot advise you at this time to spend further time on the situation. I will remain in close touch with Mr. Numero, and if at any time in the future I see that the matter would warrant further attention on your part, I will be in immediate contact with you.

Westinghouse remained out of the picture until shortly after December 19, 1960 when the defendant sent its notice of termination to Thermo King. On December 22, 1960, M & B advised Westinghouse of this development and negotiations were resumed. On June 30, 1961, Thermo King and Westinghouse entered into an acquisition agreement similar to the contract executed by Thermo King and the defendant, with a similar provision relating to brokerage fees. Westinghouse and Thermo King consummated the transaction in August, at which time Thermo King paid M & B $325,000. The letter agreement of July 11, 1960 establishing $325,000 as M & B's maximum fee was the only fee agreement between M & B and Thermo King.

██ The question presented is whether the situation calls for application of the rule stated in Restatement, Contracts § 141 (1932), as follows:

> (1) A creditor beneficiary who has an enforceable claim against the promisee can get judgment against either the promisee or the promisor or against each of them on their respective duties to him. Satisfaction in whole or in part of either of these duties, or of judgments thereon, satisfies to that extent the other duty or judgment.

I think that it does, because the defendant's only promise to M & B was its assumption on October 29, 1960 of Thermo King's obligation to M & B under the letter agreement of July 11, 1960 and because M & B had only one fee agreement with Thermo King which set the fee in the event of an acquisition by any company. I disagree with the plaintiff's contention that the defendant's obligation to the plaintiff was separate and distinct.

from Thermo King's and with his reliance upon Olds v. Mapes-Reeve Construction Co., 1900, 177 Mass. 41, 58 N.E. 478, and Kunkle v. Jaffe, 1946, Ohio App., 71 N.E. 2d 298, 47 Ohio Law Abst. 77 (1946). The *Olds* case was a suit for breach of contract by a supplier of building materials against a subcontractor who contended that damages should be mitigated by the profit made by the plaintiff in later furnishing the same materials to the prime contractor. The *Kunkle* case was a suit for breach of a brokerage agreement by a broker against his principal who contended that damages should be mitigated by the profit made by the plaintiff in later selling different parcels of real estate to the customer he had originally found for the defendant's property. The defendants' contentions were rejected in both cases. However, those cases seem clearly distinguishable from this one with respect to the nature of the agreements sued upon and the separateness of the subsequent transactions. I conclude that any obligation of the defendant to M & B was discharged by Thermo King's payment of $325,000 in August 1961 and rest my decision on the motion for summary judgment on that ground too.

Plaintiff has argued for an alternative theory of recovery, tortious interference by the defendant with M & B's relationship to Thermo King. This claim does not appear in the complaint unless it be read into paragraph 10 which states that Transitron "wrongfully prevented the effecting and consummation of the transaction." Even this generous reading of the complaint does not disclose a claim upon which relief can be granted.[5] Cases which consider tortious interference with business relations, e. g., Keene Lumber Co. v. Leventhal, 1 Cir., 1948, 165 F.2d 815, and contractual relations, e. g., Beekman v. Marsters, 1907, 195 Mass. 205, 80 N.E. 817, 11 L.R.A.,N.S., 201, and Keegan v. O'Donnell, 1941, 310 Mass. 346, 37 N.E.2d 995, require that the defendant

intentionally cause a pecuniary loss to the plaintiff by interfering with a relationship between the plaintiff and a third party. There are no such allegations in the complaint in this case nor has there been any showing, by affidavit, deposition or otherwise, that any facts exist which would support such a cause of action at a trial.

The defendant's motion for summary judgment is granted and the complaint is dismissed.

---

5. The law of Massachusetts governs this theory of the plaintiff, since any tortious interference presumably occurred in this state and there is no allegation that it occurred elsewhere.